1
2
3
4
5
6          IN THE UNITED STATES DISTRICT COURT
7
8          FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   DANNY ALFRED FONTANA,                          No. C 11-3701 WHA
11              Petitioner,
12      v.                                           **ORDER DENYING SECTION
                                                     2254 PETITION FOR WRIT OF
13   FRANK X. CHAVEZ, Warden Sierra                  HABEAS CORPUS**
     Conservation Center–Jamestown,
14   California Department of Corrections,
     ATTORNEY GENERAL OF THE STATE
15   OF CALIFORNIA,
16              Respondents.
17   _____/
18
19                      **INTRODUCTION**
20         In this federal habeas action brought by a state prisoner under 28 U.S.C. 2254, venue is
21   proper because petitioner was convicted in California Superior Court in the City and County of
22   San Francisco.  Petitioner brings five claims for relief, alleging violations of his constitutional
23   rights of due process, confrontation, and presentation of evidence.  For the reasons stated below,
24   the petition is **DENIED**.
25                       **STATEMENT**
26         Petitioner Danny Alfred Fontana is currently serving a sentence of 89 years to life in
27   prison in the Sierra Conservation Center in Jamestown, California.  He is represented by counsel
28   on this petition.  On June 16, 2004, petitioner was charged with the following four counts:

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

(1) two counts of forcible digital penetration in violation of California Penal Code Section 289(a); (2) one count of forcible oral copulation in violation of California Penal Code Section 288a(c)(2); and (3) one count of assault with intent to commit rape, digital penetration, and oral copulation in violation of California Penal Code Section 220 (CT 67–73).  Each of the counts included enhancement allegations.  Petitioner was tried by a jury and convicted of one count of forcible digital penetration, forcible oral copulation, and assault with intent to commit rape, digital penetration, and oral copulation, all by use of a deadly weapon (CT 610–12).  A mistrial was declared as to one count of forcible digital penetration.  Petitioner was not charged with forced penile penetration (CT 617).

**1.    OFFENSE CONDUCT.**

The sexual crimes for which petitioner was convicted occurred in his room at the Winsor Hotel, a single-room-occupancy hotel, in San Francisco, on March 5, 2003.  Petitioner was forty-seven years old.  Irene S., who was then nineteen years old and had immigrated from the Philippines two years earlier, testified at trial that petitioner "pulled her into his room, strangled her until she lost consciousness, threatened to kill her, and forcibly penetrated her digitally and forced her to orally copulate him."  Petitioner, a registered sex offender, admitted in his trial testimony that "he had attempted to strangle Irene but denied any sexual contact or attempted sexual contact with her."  *People v. Fontana*, 49 Cal. 4th 351, 355 (2010).

On March 5, around 4:00 p.m., prior to the offense conduct, Irene went to the discount store located below the Winsor Hotel in search of a cheap laptop computer for school.  She regularly passed this store on her way to school and had befriended Aslem Shaikh, the store manager.  Irene agreed to open and close the store for Shaikh when he could not be there.  Because Irene was small in stature, petitioner, who lived upstairs occasionally assisted Irene in opening and closing the metal gate to the store (*ibid.*).

Petitioner was at the store the day of the incident.  He told Irene that he had a laptop he could sell to her but that she would need to go to his room upstairs to view it because he did not want to bring it downstairs.  Irene asked Shaikh to accompany her upstairs but he could not because he had to stay downstairs tending the store.  Petitioner left the store and about ten

minutes later Irene called him to inquire about the laptop.  He restated that she would need to go to his room to look at it (*ibid.*).

Irene arranged to meet petitioner at the front counter of the Winsor Hotel.  She told the hotel manager's son, Amit Patel, that she was "just gonna be in the hallway . . . I just want to let you know."  In compliance with the hotel's policy, she left her keys at the security desk.  Petitioner met Irene in the hallway.  He pointed to his room, indicating he was going to grab the laptop (*ibid.*).

Instead, petitioner pulled Irene by the neck into his room and pushed her down into his bed (*id.* at 356).

> Irene tried to shout, but her voice could not make a sound. Defendant picked up a dumbbell and warned her, 'I will kill you if you scream more.'  His hands continued to constrict her throat, making it difficult for her to breathe, and she passed out.
>
> When she woke up, she was completely naked and defendant was on top of her.  She had urinated on herself and was scared. Defendant digitally penetrated her.  She begged him not to do this, but he kept choking her and telling her he would kill her if she did not cooperate.  As he continued to choke her, she lost consciousness a second time.  She testified, 'I thought I was dead already,' but she awoke to the sound of his voice.  He was kissing her all over her body.  He told her to 'blow' him, but she had to ask him 'what it is.'  Once he explained what he wanted, she said 'no,' but he forced her to do it anyway.  'So I took a chance that if I did it, I will live.  That's why I'm still here.'
>
> Irene pleaded with defendant to let her go.  Defendant replied, 'I don't know if you're going to go to the police or not.  But you have to do some nude picture[s] for me so you won't go to the police.'  Irene complied because she was afraid for her life.  He took four or five pictures, and penetrated her digitally one more time.  Defendant told her he wanted her to be his girlfriend.  He said he would walk her to school every day.  He told her he knew she would not go to the police, because he would post the pictures on the Internet if she did.  As Irene got dressed, she promised herself that if she ever got out of the room, 'he will pay for this.' So he wouldn't do that to somebody else.'

Petitioner walked Irene out of his room.  Irene told the manager's son Patel that she had been raped and asked him to call the police.  She encountered Shaikh as he was locking up the store and she told him petitioner had raped her.  Shaikh advised Irene to call the police, but she wanted to first go home to tell her father what happened, which is what she did.  Her father called the police.  Irene described these events to the police at her apartment, to the nurses at the rape

3

treatment center, and to the police inspector who interviewed her at the hospital (*id.* at 356–57).

Irene testified that she did not know if petitioner put his penis inside her vagina (RT 268–69).

### 2. IRENE'S MEDICAL CONDITION.

At trial, there was testimony of Irene's medical condition shortly after the incident. That testimony is summarized here. *Fontana*, 49 Cal. 4th at 357:

> Nurse practitioner Gretchen Johonson-Gelb testified that Irene had petechiae (broken capillaries) all over her face and scalp, a throat that was sore inside and out, a hoarse voice, and difficulty swallowing. Irene also had an abrasion and a bruise on her neck as well as additional petechiae and swelling there. There was hemorrhaging in the sclera of both eyes. A laryngologist found petechiae inside both ears all the way to her eardrums, an engorgement of blood in her throat, and congestion of blood in her nose. Johnson-Gelb testified that these injuries were consistent with strangulation, which can also cause involuntary urination, and that the petechiae injuries were the worst she had even seen in a live person.

> Johnson-Gelb observed injuries that were consistent with forcible oral copulation: an injury to Irene's frenulum, which connects the tongue to the bottom of the mouth, and two lacerations on the interior of her lower lip. There were also injuries that were consistent with forcible digital penetration — a possible laceration on her cervix, which was consistent with a fingernail injury, and erythema on the cervix and right labia minora — but Johnson-Gelb was unable to study these injuries for any length of time because Irene could not tolerate the use of a speculum.

> Dr. Amy Hart, a forensic pathologist, confirmed that Irene's injuries were consistent with strangulation, which could cause a loss of consciousness and bladder control. Dr. Hart also stated that the condition of Irene's cervix was consistent with forcible digital penetration and that her mouth injuries were consistent with forcible oral copulation. In Dr. Hart's opinion, the injuries appeared to have been created within the same three-to-five hour window.

Dr. Marc Snyder, medical director of the emergency department at St. Luke's, examined a photograph from the speculum examination of Irene and did not observe a laceration of the cervix and "opined that the cervix's condition could be a normal variant or the result of an infection" (*id.* at 361).

Irene testified during the *in camera* hearing that her boyfriend did not do anything that could have injured her during their consensual sexual encounter earlier in the day of the incident (02/07/2007, RT 12–13). Petitioner had previously admitted that he strangled Irene. *Fontana*, 49

United States District Court
For the Northern District of California

1    Cal. 4th at 364.

2        **3.    PHYSICAL EVIDENCE.**

3        A swab from Irene's neck tested positive for the presence of saliva and indicated the

4    presence of petitioner's DNA.  Vaginal swabs were also taken.  Petitioner's DNA was not found

5    present in the vaginal swabs.

6        Petitioner's room was searched on March 6.  Police found a pair of eight-pound dumbbells

7    and an empty camera case.  They did not find a laptop.  Five nude photographs of Irene were

8    found at petitioner's girlfriend's home (*id.* at 358).

9        **4.    PRIOR CONVICTIONS.**

10        Petitioner was convicted of rape in 1975.  He was convicted of false imprisonment, assault

11    with intent to commit rape, and attempting to dissuade a witness in 1992.  Nina T., the victim of

12    the 1992 crimes testified before the jury that her car was being repaired at a mechanic shop where

13    defendant worked (*ibid*):

14            One day, on the pretext that her car was ready, he told her to come
              to the shop and invited her up to the loft.  He quickly moved on top
15            of her and placed a knife at her throat.  He ordered her to undress
              and tried to penetrate her with his partially erect penis.  He asked
16            her whether she had ever given 'head.'  She said she had not.  He
              said, 'Well, there's a first time for everything, isn't there?' but did
17            not follow through.  He also asked whether she would prefer it 'in
              your butt'; she said no.  At that point, defendant started crying.  He
18            said he liked her and did not want to hurt her.

19        **5.    PETITIONER'S TESTIMONY.**

20        Before the jury, petitioner testified that he "had a propensity to commit sex offenses and

21    had been classified as a high-risk sex offender."  He testified that Irene had voluntarily gone to

22    his room and she told petitioner she did not have the money to pay him for the laptop and hoped

23    she could have the laptop as maybe part of "her pay or commission when we opened the store."

24    (Petitioner testified that previously he had been interested in opening a used goods store and had

25    talked with Irene about this goal.)  According to petitioner, Irene then began taking her clothes

26    off.  Petitioner took his clothes off and sat on the bed next to Irene.  Petitioner "claimed he saw

27    semen 'between her legs in her privates' at that point and was 'disgusted,' so he got some toilet

28    paper and told her, 'You need to wipe yourself off.'  He took the toilet paper into the hall

United States District Court
For the Northern District of California

5

United States District Court

For the Northern District of California

1  bathroom and flushed it down the toilet, claiming that he put his shirt on before he left and

2  removed it when he came back" (*id*. at 358–60).

3      When petitioner returned to his room, he claims Irene asked if she could have the laptop

4  now.  He further states that he took out his camera to take photos of her to prove he did not do

5  anything wrong and to prevent Irene from making false accusations against him.  While petitioner

6  was taking photos of her, Irene "unfastened his trousers, pulled out his penis, and moved her

7  mouth close to it."  Because of petitioner's apparent life-long fear of having his penis bitten off,

8  he dropped the camera and grabbed Irene around the throat.  Petitioner denied having and

9  attempting to have intercourse with Irene and he denied digitally penetrating her (*id*. at 360).

10      The Court has reviewed, the photographs that were marked as trial Exhibits 5A-E, which

11  were the photographs taken of Irene by defendant.  Irene's face is entirely visible in two of five of

12  the photographs and only partly visible in a third.  In one photograph she has her eyes closed and

13  her face is slightly turned up toward the ceiling.  In another, her eyes are open and she is looking

14  directly into the camera with a stern, cold face.  In the third, her eyes are closed and the remainder

15  of her face is not visible.  Irene's neck is not visible.  And the photographs are not of sufficiently

16  high resolution or clarity for the Court (not trained in the medical profession) to determine

17  whether there were petechiae (broken capillaries) visible on Irene's face, scalp, or throat when the

18  photographs were taken.  One photograph, however, does show what appears to be a bruise on

19  Irene's forehead.  Regardless, it is clear that Irene is not smiling in any of the photographs and

20  does not appear to be happy.

21      **6.    JURY VERDICT.**

22      Petitioner was found guilty of forcible digital penetration in violation of California Penal

23  Code Section 289(a), forcible oral copulation in violation of Section 288a(c)(2), and assault with

24  intent to commit rape, digital penetration, and oral copulation in violation of Section 220, all by

25  use of a deadly weapon (CT 610).  The jury also determined that petitioner had previously been

26  convicted of a sex offense within the meaning of California's One Strike Law, and in a bifurcated

27  proceeding, the court found that he had two prior serious felony convictions that were "strikes."

28

6

Petitioner was sentenced to a prison term of 89 years to life, consisting of a term of 75 years to life plus a determinate term of 14 years for forcible oral copulation.[1] *Fontana*, 49 Cal. 4th at 361.

A motion for new trial was filed on November 20, 2006. The motion was denied as to counts one, two, and three. On its own motion, the trial court conducted a post-trial *in camera* hearing to hear additional testimony from Irene. Defense counsel and the prosecutor were present for the post-trial *in camera* hearing. The prosecutor was permitted to conduct a direct examination of Irene. The trial judge also asked questions. Defense counsel was permitted to cross-examine Irene and the prosecution conducted a re-direct (02/07/2007 RT). On March 29, 2007, petitioner was committed to the custody of the California Department of Corrections.

### 7. PROCEDURAL HISTORY.

Petitioner has exhausted his state court remedies as to the claims brought in this petition. On direct appeal, the California Court of Appeal, in an unpublished opinion unanimously reversed the judgment of convictions on January 13, 2009. The California Supreme Court granted review on April 15, 2009. On June 16, 2009, petitioner filed a motion to expand the issues on review. The motion was denied on August 12. On June 21, the California Supreme Court reversed the judgment of the Court of Appeal, remanding the case for further proceedings regarding issues briefed but not discussed in the January 13 decision. On September 30, 2010, the Court of Appeal issued an unpublished opinion striking a $15,000 fine imposed by the trial court but otherwise affirming the conviction. Petitioner filed a petition for rehearing regarding the Court of Appeal's failure to resolve one of the federal issues raised in his initial briefing. The petition for rehearing was denied on October 27, 2010, but the Court of Appeal modified its opinion to include a discussion of the federal issue. On November 8, 2010, petitioner filed a petition for review in the California Supreme Court requesting review of the federal issues raised and briefed in the Court of Appeal and petitioner's motion to expand issues for review filed in the Supreme Court. The petition was denied on January 12, 2011. Petitioner did not file a habeas petition in state court and has not previously filed a habeas petition in federal court.

---

[1] California's One Strike Law (less commonly known that California's Three Strikes Law) mandates a minimum sentence of either fifteen or twenty-five years to life for violent sex offenders. *See* Cal. Pen. Code § 667.61.

**United States District Court**
For the Northern District of California

**ANALYSIS**

Petitioner brings five claims for habeas relief, all of which are based on his theory that evidence was improperly excluded from trial.  He contends that:  (1) the exclusion of evidence regarding Irene's prior consensual sexual activity earlier that day, which could have provided an alternative explanation for Irene's injuries, violated petitioner's constitutional rights and was not harmless error; (2) the failure to admit Irene's prior consensual sexual activity and related DNA evidence to explain her alleged false allegation of rape deprived petitioner of his federal constitutional rights and was not harmless error; (3) the exclusion of evidence that Irene lied about the terms of her employment violated petitioner's constitutional rights and was not harmless error; (4) the exclusion of evidence that could have corroborated petitioner's testimony violated his constitutional right to present evidence and was not harmless error; and (5) the cumulative errors violated petitioner's constitutional rights to due process.

Having carefully considered each of these contentions, the order concludes that exclusion of the above-stated evidence did not violate petitioner's constitutional rights, and even if, as to the first claim, there was an error of constitutional dimension, any such error was harmless.

\*          \*          \*

The Antiterrorism and Effective Death Penalty Act of 1996 imposes a highly deferential standard for evaluating state court rulings and requires that state court decisions be "given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, while the second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

United States District Court
For the Northern District of California

1   Petitioner bears the burden of showing that the state court's decision was unreasonable. *Viscotti*,

2   537 U.S. at 25.

3       **1.      CLAIM THAT EXCLUSION OF EVIDENCE OF IRENE'S PRIOR CONSENSUAL
                SEXUAL CONDUCT WAS NOT HARMLESS.**

4       At trial petitioner sought to introduce evidence that Irene had had consensual sex earlier in

5   the day with a third party (her boyfriend) before the alleged sexual assault.  During trial, defense

6   counsel filed a written motion and declaration under California Evidence Code Section 782,

7   requesting to admit evidence that Irene had had consensual sexual contact with a third party the

8   day of the alleged attack.  The trial judge denied the motion and:

9
                admitted that 'the most persuasive' part of the motion was the
10              tendency of this evidence to provide an 'innocent explanation' for
                the injuries to Irene's vagina and cervix, which 'might have
11              compelling force in this motion, if that was the only evidence of
                force.'  But in this case, the court went on, evidence of these
12              injuries was on its own 'not very strong against your client' with
                respect to the issue of force, nor was it a 'substantial part' of the
13              People's case, in light of 'all the rest of the evidence regarding . . .
                the tremendous application of force causing her lack of
14              consciousness.  Accordingly, 'the need to go into this and establish
                that yes, indeed, she did have consensual sexual relations,
15              diminishes quite a bit.

16  *People v. Fontana*, 49 Cal. 4th at 365.  Petitioner contends that that evidence could have provided

17  an alternative explanation for Irene's vaginal, cervical, and oral injuries and that the exclusion of

18  the evidence was prejudicial federal constitutional error under *Brecht v. Abrahamson*, 507 U.S.

19  619 (1993), and *Delaware v. Van Arsdall*, 475 U.S. 673 (1986) (Br. 22).

20      *First*, this section reviews the California Supreme Court decision regarding petitioner's

21  argument as to this claim.  *Second*, it turns to review applicable United States Supreme Court

22  precedent that guides our inquiry here.  *Third*, it reviews the relevant factual background.  *Fourth*,

23  it makes factual determinations.  *Fifth*, it assesses whether, assuming there was an error of

24  constitutional dimension, exclusion of the evidence at issue was harmless error.

25          **A.      California Supreme Court Decision.**

26      The California Supreme Court held that the trial court should have held a hearing, as

27  required by California Evidence Code Section 782(a)(3), during the trial to assess the evidence of

28  Irene's prior sexual activity for its tendency to provide an alternative explanation of her vaginal,

9

cervical, and oral injuries.  The California Supreme Court recognized "the possibility that the condition of Irene's cervix and mouth could have been explained by her consensual sexual activity with her boyfriend that morning.  If credited, this chain of reasoning could have created a reasonable doubt as to petitioner's guilt of the sex-related offenses."  Thus, the California Supreme Court  concluded that the "trial court should have conducted a hearing to permit [petitioner] to establish the truth of the hearsay reports of Irene's sexual activity that day and the timing of that activity, and to explore the possible connection between that activity and the condition of Irene's mouth and cervix as viewed at the hospital that evening."  *Fontana*, 49 Cal. 4th at 365–67.

The California Supreme Court, however, found that with respect to the condition of Irene's cervix (*ibid*):

> [F]ailure to conduct the hearing was assuredly harmless . . . inasmuch as the trial court did ultimately conduct a hearing as to those injuries after defendant filed a motion for new trial based on the exclusion of the evidence of Irene's sexual activity earlier that day . . . . At the hearing, Irene testified that she and her boyfriend had had sex that morning twice between 9:00 a.m. and noon, that he did not insert any foreign object inside her, and that he did not do anything that might have cut or injured her cervix.  Because the evidence at the posttrial hearing rebutted the defense theory of relevance, we can conclude that the failure to conduct the hearing during the trial was harmless, in that the record now shows that the trial court did not abuse its discretion at trial in excluding the evidence of Irene's sexual conduct.

No hearing was held to determine whether Irene's earlier consensual sexual conduct could have accounted for her oral injuries.  The trial judge stated the scope of the post-trial *in camera* hearing would be to address, "[w]hether the morning consensual sexual conduct bears significantly on who caused the arc like possible laceration of the cervix" (02/07/2007 RT 5).  The California Supreme Court concluded that "even if one were to assume that a hearing would have established the existence and relevance of oral sexual conduct by [Irene] earlier that day, the exclusion of such evidence was harmless under any standard" (*id*. at 368).

The California Supreme Court reasoned (*ibid*.):

> The jury found beyond a reasonable doubt that defendant digitally penetrated the victim, as the victim had testified and contrary to defendant's testimony that he had no sexual contact with the victim at all.  In making this finding, the jury necessarily rejected

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

defendant's claim that he had lashed out violently (but not sexually) at the victim because of his lifelong fear of having his penis bitten off during oral sex.  Moreover, defendant's testimony about his lifelong fear or oral sex was thoroughly rebutted by his admissions that he had demanded oral sex from Nina T. in 1992 and that he engaged in oral sex with his current girlfriend.  Because defendant has offered no other basis on which the jury could have credited Irene's testimony that defendant forcibly penetrated her digitally but would have disbelieved her testimony that defendant forced her to orally copulated him, any error in excluding evidence of her prior sexual conduct was harmless beyond a reasonable doubt.

**B.      Applicable Supreme Court Precedent**.

8

9

10

11

12

13

        Contrary to petitioner's assertion, the California Supreme Court did not find federal constitutional error.  Federal habeas review "does not lie for errors of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Thus, the relevant inquiry is whether the California Supreme Court's failure to find a federal constitutional violation in exclusion of the evidence of Irene's prior sexual conduct amounted to an unreasonable application of United States Supreme Court precedent.

14

15

16

17

18

19

20

21

22

23

24

        In *Moses v. Payne*, our court of appeals recently concluded that the balancing test refined in *Miller v. Stagner*, 757 F.2d 988 (9th Cir. 1985), to determine when a trial court's exercise of discretion to exclude evidence under an otherwise valid evidentiary rule might violate a petitioner's constitutional rights, does not apply in the context of habeas review under Section 2254(d)(1).  555 F.3d 742, 759–60 (9th Cir. 2009).  For purposes of Section 2254(d)(1) review, "the only definitive source" of clearly established federal law are Supreme Court holdings as of the time of the state court decision.  Because the *Miller* balancing test is a "creation of circuit law, rather than a Supreme Court holding, we cannot fault the state appellate court for not employing it, so long as the state's ultimate disposition . . . is not contrary to or an unreasonable application of . . . Supreme Court precedent."  *Ibid.*

25

26

27

28

        Petitioner contends that the trial court's failure to conduct a hearing to determine whether Irene's prior sexual conduct with her boyfriend could have provided an alternative explanation for her oral injuries was not harmless error and that the trial court's failure to hold a hearing regarding Irene's vaginal and cervical injuries was not cured by Irene's post-trial testimony and was also not harmless error (Br. at 22).  The Supreme Court has not "squarely address[ed]

whether a court's exercise of discretion to exclude [evidence] violates a criminal [petitioner's] constitutional right to present relevant evidence." *Moses*, 555 F.3d at 758.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  The United States Supreme Court has further elaborated that:

> . . . the range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

AEDPA "does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). "[A] habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fair[-]minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

The following United States Supreme Court decisions guide our analysis as they are instructive on when a trial court's exclusion of evidence violates a defendant's constitutional rights.

In *Holmes v. South Carolina*, the trial court excluded evidence of third-party guilt, which would have been "a major part of [the] defense."  547 U.S. 319, 322 (2006).  Specifically, the trial court excluded evidence that the state's forensic evidence had been contaminated, that law enforcement officers had engaged in a plot to frame the petitioner, and that another man acknowledged petitioner's innocence or admitted to committing the crimes himself.  *Id*. at 322–23.  The trial court excluded the evidence citing a state supreme court case that held "where there is strong evidence of [the petitioner's] guilt, especially where there is strong forensic

<div style="float:left">United States District Court<br>For the Northern District of California</div>

1  evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable

2  inference as to the [petitioner's] own innocence." *Id.* at 324 (citation omitted).  The rule focused

3  on evaluating the strength of only one party's evidence, from which evaluation "no logical

4  conclusion can be reached regarding the strength of contrary evidence."  Exclusion of defense

5  evidence under this rule failed to serve a legitimate purpose.  Thus, the Supreme Court reversed

6  the judgment of the state supreme court and remanded the case.

7       In *Washington v. Texas*, the evidence showed that either petitioner or his companion,

8  Charles Fuller, fired the fatal shot in a murder case.  388 U.S. 14 (1967).  The record showed that

9  Fuller would have testified that he, not defendant, fired the fatal shot, and that Fuller was the only

10  person other than defendant who knew who fired the gun.  "It is undisputed that [the

11  companion's] testimony would have been relevant and material, and that it was vital to the

12  defense."  *Id.* at 16.  The defense sought to introduce testimony from Fuller that would have

13  corroborated defendant's testimony that Fuller fired the fatal shot.  The trial court excluded the

14  evidence because a Texas state statute provided that the persons convicted as co-participants in

15  the same crime could not testify for one another.  Fuller had been previously convicted of the

16  same murder.  The Supreme Court found the state rule to be irrational and held that the defendant

17  (*id*. at 23):

18       was denied his right to have compulsory process for obtaining
         witnesses in his favor because the State arbitrarily denied him the
19       right to put on the stand a witness who was physically and
         mentally capable of testifying to events that he had personally
20       observed, and who testimony would have been relevant and
         material to the defense.

21       In *Chambers v. Mississippi*, a murder defendant called as a witness Gable McDonald, who

22  had previously confessed to the murder.  410 U.S. 284 (1973).  The witness took the stand and

23  repudiated the confession.  The state's hearsay rule prohibited defendant from impeaching his

24  own witness and presenting evidence from three witnesses that McDonald had separately

25  confessed to each of them that he committed the murder.  The Supreme Court found that

26  "Chambers' defense [that he did not commit the murder] was far less persuasive than it might

27  have been had he been given an opportunity to subject McDonald's statements to cross-

28

<div align="center">13</div>

examination or had the other confessions been admitted." *Id*. at 294.  The Supreme Court

concluded that (*id*. at 302):

> Although perhaps no rule of evidence has been more respected or
> more frequently applied in jury trials than that applicable to the
> exclusion of hearsay, exceptions tailored to allow the introduction
> of evidence which in fact is likely to be trustworthy have long
> existed.  The testimony rejected by the trial court here bore
> persuasive assurances of trustworthiness and thus was well within
> the basic rationale of the exception for declarations against
> interest.  That testimony also was critical to Chambers' defense.  In
> these circumstances, where constitutional rights directly affecting
> the ascertainment of guilt are implicated, the hearsay rule may not
> be applied mechanistically to defeat the ends of justice.
>
> We conclude that the exclusion of this critical evidence, coupled
> with the State's refusal to permit Chambers to cross-examine
> McDonald, denied him a trial in accord with traditional and
> fundamental standards of due process.

In *Crane v. Kentucky*, the defendant was prevented from introducing testimony "about the

physical and psychological environment in which the [defendant's] confession was obtained."

476 U.S. 683, 684 (1986).   By the prosecutor's own admission, its case rested almost entirely on

defendant's confession.  Under Kentucky law, "a trial court's pretrial voluntariness determination

is conclusive and may not be relitigated at trial."  *Id*. at 686.  In a pretrial ruling, the trial court

found the confession to be voluntary.  The California Supreme Court concluded that because the

proposed testimony about the physical and psychological environment "pertained only to the

voluntariness question," there was not error in excluding it.  *Id*. at 687.  Relying on its own

precedent, the Supreme Court stated evidence about the environment in which the police secured

the confession is often "highly relevant to its reliability and credibility."  *Id*. at 691.  Furthermore:

> [Defendant's] entire defense was that there was no physical
> evidence to link him to the crime and that, for a variety of reasons,
> his earlier admission of guilty was not to be believed.  To support
> that defense, he sought to paint a picture of a young, uneducated
> boy who was kept against his will in a small, windowless room for
> a protected period of time until he confessed to every unsolved
> crime in the county, including the one for which he now stands
> convicted.  We do not, of course, pass on the strength or merits of
> that defense.  We do, however, think it plain that introducing
> evidence of the physical circumstances that yielded the confession
> was all but indispensable to any chance of its succeeding.

Neither the California Supreme Court nor the prosecution advanced any rational reason for

excluding the evidence.

14

United States District Court

For the Northern District of California

In *Olden v. Kentucky*, the defendant and his co-defendant mounted a defense of consent as to the charges against them for kidnapping, rape, and forcible sodomy.  488 U.S. 227 (1988).  The co-defendant was acquitted on every charge.  The defendant was acquitted on the kidnapping and rape but convicted of forced sodomy.  At trial, the defendant sought to introduce evidence that the alleged victim and another prosecution witness, Bill Russell, were involved in an extra-marital relationship at the time of the incident.  The defense sought to impeach the alleged victim by introducing evidence that the victim and Mr. Russell were living together by the time of trial, and that defendant had been falsely accused so that the victim could protect her relationship with Mr. Russell.  The trial court excluded the evidence because it showed an inter-racial relationship and was thus more prejudicial than probative, in the trial court's judgment.  The Supreme Court stated, "speculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential."  The Supreme Court found constitutional error:

> Here [the victim's] testimony was central, indeed crucial to the prosecution's case.  Her story, which was directly contradicted by that of petitioner . . . was corroborated only by the largely derivative testimony of Russell, whose impartiality would also have been somewhat impugned by revelation of his relationship with [the victim].  Finally, . . . the State's case against petitioner was far from overwhelming.

Together, these decisions establish the general principle that a trial court's exclusion of evidence violates a defendant's constitutional rights when the excluded evidence is trustworthy, critical to the defense, and where exclusion serves no legitimate purpose.  Here, we must determine whether the California Supreme Court's decision is an unreasonable application of this general principle.

### C.   Relevant Factual Background.

The excluded evidence at issue was evidence that Irene had had consensual sex earlier in the day before the encounter with petitioner.

### (1)   Trial Evidence Regarding Mouth Injuries.

The prosecution's two medical witnesses testified that the injuries to Irene's mouth were consistent with forced oral copulation.  Nurse practitioner Johnson-Gelb, who examined Irene upon her arrival to the emergency room, testified that the frenulum injury observed in Irene's

mouth "is consistent with forced oral copulation . . . and also possibly the lacerations inside of her lip from touching her own teeth" (RT 557).  On cross examination, she stated that her (RT 590–91):

> exam was consistent with the history [Irene] gave.  And . . . that you can find injuries like the ones [Irene] has from forced oral copulation.  Am I 100 percent saying her injury came from forced oral copulation?  No.  Because you can always say it came from something else.  I am saying it was consistent with the history, and it was consistent . . . with other times we have seen the same injuries that are documented also in many books about injuries from oral copulation.

Dr. Amy Hart, another of the prosecution's medical witnesses stated that the "tear on [Irene's] lip and the redness in the frenulum area could be consistent with forced oral copulation . . . [because] the presence of an injury and the redness indicate that an individual may have been struggling against the — an insertion of an object into the mouth" (RT 743).  On cross-examination, when asked if the injuries to the mouth were also consistent with voluntary sexual activity, Dr. Hart responded, "It's possible" (RT 767).

The defense's medical expert Dr. Marc Snyder testified that the injuries to Irene's mouth were "as consistent with strangulation as they are with direct contact or direct injury" (RT 606).  On cross-examination, he stated that Irene's injury was consistent with forced oral copulation (RT 613).

### (2) Trial Evidence Regarding Vaginal and Cervical Injuries.

Nurse practitioner Johnson-Gelb testified that Irene presented with the following conditions:  (1) erythema (redness) of the right labia minora (RT 522–23); (2) generalized erythema to the lower vestibule (opening of the vagina) (RT 523); (3) generalized erythema on the cervix (RT 524), and (4) an arc-shaped possible laceration of the cervix (RT 524).  Nurse practitioner Johnson-Gelb testified that "[w]ith digital penetration, we often see injuries more — we see injuries more often with digital penetration than penile penetration, because of fingernails" (RT 552).  She testified on redirect that the erythema "would be more from trauma related than just physiological response" (RT 596).  "And in terms of the consensual, non consensual, as I have already stated, I can never say, I have never said that something for sure 100 percent happened from a sexual assault" (RT 597).

Dr. Hart testified that "[w]ith irregular areas of redness, as well as a tear on the cervix, that that could be evidence of forced penetration without consent" (RT 742–43).  She further testified that a finger could have caused the "tearing of the cervix" (RT 743).  On cross-examination when asked if the condition of Irene's cervix could have been the natural condition of the cervix, she answered, "Yes" (RT 767).  When asked if the injuries to the cervix were consistent with voluntary sexual activity, she said, "[i]t's possible" (RT 767).

On redirect, the prosecutor asked, " taking all these injuries together, are these injuries more consistent with strangulation and sexual assault, or consensual sex?"  Dr. Hart responded, "The group of injuries all together are more consistent with a strangulation and sexual assault" (RT 773).  On re-cross, defense counsel asked, "But it's not your testimony, nor could it be, that that is what happened; is that correct?"  Dr. Hart responded, "That's correct" (RT 773–74).

Dr. Synder, the defense's expert testified that he "did not see any specific lesion that was described as an arc lesion or a possible laceration on the photograph" and that the appearance of the cervix "may be a normal variant" or the result of an "infection" (RT 601).  He further testified, what the "vaginal photographs" depict "doesn't appear to me to be that impressive as an irregularity or as trauma" (RT 616).  On re-direct, Synder testified that, "[t]he only — apart from the photographs, the only thing that is suggestive of injury is the report of tenderness.  And that injury could have been consensual sex or sexual assault.  I can't speak to that" (RT 618–19).

### *(3)*     *Post-trial Hearing.*

In ruling on a motion for new trial, the trial court found that there was no error in the exclusion of evidence as to the forcible oral copulation count, but that "if there was error, in view of all the other evidence in this case of force and lack of consent, the error is harmless and did not result in a miscarriage of justice in this trial or deny the defendant a fair trial under [the] California Constitution" (01/29/2007 RT 42–43).  Likewise, the trial court found no error in the exclusion of evidence as to count one for forcible digital penetration (*ibid*.).  However, "to reduce the scope of speculation . . . regarding the issue of prejudice," the court held a post-trial *in-camera* hearing, over the objection of defense counsel, to consider "[w]hether the morning

17

United States District Court
For the Northern District of California

1  consensual sexual conduct bears significantly on who caused the arc like possible laceration of

2  the cervix" (1/29/2007 RT 43; 2/7/2007 RT 5).

3      At the hearing, Irene testified she had vaginal sex with her boyfriend, once without a

4  condom and once with a condom, "around 9:00 to 12:00" the morning of the alleged sexual

5  assault.  She did not remember if he ejaculated when he was not wearing the condom (02/07/07

6  RT 7, 11, 13).

7      When asked if he did "anything that might have injured you or your cervix," Irene

8  responded, "[n]o, he did not . . . [h]e did not put anything."  The court asked, "He didn't put

9  anything inside you?"  Irene responded, "My cervix, no."  The court asked Irene, "I used the word

10 "cervix," "do you understand what I was talking about?"  Irene responded, "Yes.  Yes."  The

11 court then inquired into Irene's understanding of what the cervix is and where it is located."  She

12 answered, "Inside a female's vagina . . . . It's inside.  I don't know.  I cannot describe it" (RT

13 11–12).  The court then asked, "Did your boyfriend do anything that you felt could have injured

14 you?"  Irene answered, "No.  He wouldn't do that to me."  She was then asked, "Did he do

15 anything that could have cut you or caused an injury inside of you?"  She responded, "No" (RT

16 13).[2]

17                    *          *          *

18      The question for this Court is whether the courts' failure to find a federal constitutional

19 violation in the exclusion of evidence of Irene's prior consensual sexual conduct amounted to an

20 unreasonable application of United States Supreme Court precedent.

21      **D.    Factual Determinations.**

22      "Factual determinations by state courts are presumed correct absent clear and convincing

23 evidence to the contrary."  *Miller-El*, 537 U.S. at 340.  A defendant must present clear and

24 convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory

25 assertions will not do.  *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001), *amended*, 253 F.3d

27      [2] The vagina is the "genital canal in the female, extending from the uterus to the vulva." Stedman's
28 Med. Dictionary 430230 (27th ed. 2000).  The cervix is the "lower part of the uterus extending from the isthmus
   of the uterus into the vagina."  *Id*. at 71160.

18

United States District Court

For the Northern District of California

1150 (9th Cir. 2001).  Under Section 2254(d)(2), a state court decision "based on a factual

determination will not be overturned on factual grounds unless objectively unreasonable in light

of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

The California Supreme Court found:

> There was expert testimony that the injuries to Irene's cervix and
> to her mouth could have been caused by consensual sex and that
> these injuries could have been inflicted three to five hours before
> the strangulation injuries.  The testimony of other witnesses
> indicated that strangulation injuries must have been inflicted
> sometime between 4:30 and 5:30 p.m. — meaning that Irene could
> have suffered the injuries to her mouth and cervix through
> consensual sex that occurred as early as 11:30 a.m.  Irene had
> reportedly told a nurse at the rape treatment center that she had had
> consensual sex earlier that day, and she had apparently explained
> to the prosecutor that this had occurred with her boyfriend
> sometime that morning.
>
> Taken together, this evidence offered the possibility that the
> condition of Irene's cervix and mouth could have been explained
> by her consensual activity with her boyfriend that morning . . . .
>
> At the [post-trial] hearing, Irene testified that she and her
> boyfriend had had sex that morning twice between 9:00 a.m. and
> noon, that he did not insert any foreign object inside her, and that
> he did not do anything that might have cut or injured her cervix.

*Fontana*, 49 Cal. 4th at 366–67.

These factual findings are not disputed.  Petitioner contends that the California Supreme

Court's factual findings that Irene's testimony rebutted the defense theory of relevance of the

excluded evidence was unreasonable and that the California Supreme Court's holding that the

"trial court's erroneous denial of a hearing under California Evidence Code Section 782 was

cured and rendered harmless cannot stand" (Reply Br. 3).  If, however, there was constitutional

error, it was harmless.

### E.    Harmless Error Analysis.

Even assuming there was an error of constitutional dimension, exclusion of evidence of

Irene's prior consensual sexual conduct, was, on this record, harmless under *Brecht*.  In order to

obtain habeas relief on the basis of an evidentiary error, a petitioner must show that the error was

one of constitutional dimension and that it was not harmless under *Brecht*.  This requires that

United States District Court
For the Northern District of California

1  petitioner show that the error had "a substantial and injurious effect . . . in determining jury's

2  verdict." *Brecht*, 507 U.S. at 623.

3  The California Supreme Court concluded that any error in excluding the evidence of

4  Irene's prior consensual sexual conduct to explain her cervical condition would have been

5  harmless "[b]ecause the evidence at the post-trial hearing rebutted the defense theory of relevance

6  . . ." *Fontana*, 49 Cal. 4th at 367.  Indeed, at the post-trial hearing, Irene testified that during

7  consensual sex with her boyfriend the morning of the incident, he did not do anything that might

8  have injured her cervix or cut her.  She further testified, more generally, that he did not do

9  anything at all that could have injured her.  Had evidence been put in to show that the morning of

10  the incident Irene had had consensual sex, it would have been unreasonable for the jury to infer

11  from that evidence, that the condition of her cervix was the result of consensual sex.

12  With regard to the oral injuries Irene sustained, the California Supreme Court found the

13  exclusion of evidence harmless.  The court stated:

14  The jury found beyond a reasonable doubt that defendant digitally
penetrated the victim, as the victim had testified and contrary to

15  defendant's testimony that he had no sexual contact with the
victim at all.  In making this finding, the jury necessarily rejected

16  defendant's claim that he had lashed out violently (but not
sexually) at the victim because of his lifelong fear of having his

17  penis bitten off during oral sex.  Moreover, defendant's testimony
about his lifelong fear of oral sex was thoroughly rebutted by his

18  admissions that he had demanded oral sex from Nina T. in 1992
and that he engaged in oral sex with is current girlfriend.

19
*Fontana*, 49 Cal. 4th at 368.

20
Even if evidence of Irene's prior sexual conduct had been admitted, in light of the

21  evidence in this case, it would have been an unreasonable inference for the jury to draw that

22  Irene's consensual vaginal sex resulted in mouth injuries, which included injuries to her frenulum

23  and inner lip.

24
Moreover, the defense had alternative theories for explaining Irene's vaginal, cervical, and

25  oral injuries.  Defense expert Dr. Synder testified that the appearance of Irene's cervix could have

26  been a result of an infection or an abnormality of her cervix.  He further testified that the injuries

27  to Irene's mouth were as consistent with strangulation, which petitioner admitted to doing, as

28  with direct injury.

**United States District Court**
For the Northern District of California

1    There were the many indications of petitioner's guilt, which evidence of prior consensual

2    sexual conduct would not have addressed.  *First*, as part of his defense against the forced oral

3    copulation charge, petitioner testified that he had a life-long phobia of having his penis bitten off,

4    suggesting, he would not have forced Irene to orally copulate him.  But Nina T., a woman who

5    petitioner previously sexually assaulted, testified that after petitioner raped her at knife point, he

6    asked her to orally copulate him (RT 884).  The defense failed to corroborate petitioner's "phobia

7    defense."  As such, petitioner's testimony that he strangled Irene because of this phobia, was also

8    undermined.

9    *Second*, having testified, petitioner failed to offer a reasonable explanation for taking

10    photos of Irene (which were admitted into evidence).  He testified that he did it to protect himself,

11    but such photos showed a violation of his parole, and would only harm petitioner.

12    *Third*, petitioner's saliva was found on Irene's neck, which is in direct contradiction to his

13    testimony that he had no sexual contact with Irene.

14    *Fourth*, the evidence showed that Irene was reluctant to go to petitioner's room, and went

15    only after he refused to bring the laptop to her in the store.  If, as the defense theorized, Irene

16    wanted to offer sex in exchange for the laptop, she would not have refused to go to his room.

17    *Fifth*, the physical evidence corroborated Irene's account of her injuries.  She testified that

18    petitioner strangled her.  The testimony of the experts bolstered this account.  She claimed

19    petitioner took photographs of her.  The photographs proved it, and even showed, in the judgment

20    of two medical professionals, the petechiae (broken capillaries), resulting from petitioner's

21    strangulation of Irene.  Irene testified that petitioner threatened her with a dumbbell.  Dumbbells

22    were found in petitioner's room.  Irene provided essentially the same account of the events of that

23    day to the desk clerk at the hotel, immediately after the incident, to the store owner a few minutes

24    later, to her parents when she arrived at home, to the police and medical technicians who took her

25    to the hospital, to the nurses who examined her at the hospital, and to the detective who

26    interviewed her there.

27    Finally, there was the testimony of the medical experts, which provided a powerful

28    indication that the injuries were consistent with forcible oral and vaginal sex.  Evidence of prior

United States District Court

For the Northern District of California

sexual conduct that day would not have addressed the other evidence that indicated guilt. Furthermore, Irene did not testify in such a manner as to leave any impression that she did not have recent sex.  Even assuming there was an error of constitutional dimension, any such error was harmless.

> **2.      CLAIM THAT EXCLUSION OF IRENE'S PRIOR CONSENSUAL SEXUAL ACTIVITIES AND RELATED DNA EVIDENCE TO EXPLAIN IRENE'S FALSE ALLEGATION OF RAPE DEPRIVED PETITIONER OF HIS CONSTITUTIONAL RIGHT TO CONFRONTATION.**

At trial, petitioner sought to introduce evidence of DNA analysis taken from vaginal swabs obtained during Irene's rape examination that showed DNA of another man had been found on the vaginal swabs along with evidence that Irene had consensual sex with another (her boyfriend) the morning of the incident.  The trial court did allow and the jury heard testimony from the defense's DNA expert that petitioner's DNA was not found on the vaginal swab.

Defense counsel argued that evidence that another person's DNA was found on the vaginal swab and of Irene's prior consensual sexual conduct the morning of the alleged rape was relevant to the jury's evaluation of Irene's credibility.  Petitioner concluded that the trial court's exclusion of the DNA analysis of the semen "unconstitutionally deprived [him] of the opportunity to argue to the jury" that Irene withdrew her allegation of rape out of "fear that the rape examination results would prove she was lying about the rape accusation" (Br. 33).  The order takes note, however, that Irene testified in the presence of the jury that petitioner penetrated her vagina digitally and forced her to perform oral copulation.  She also testified that she was not sure if he inserted his penis into her vagina.

Petitioner further contends that the trial court's failure to admit this evidence allowed the prosecutor to argue that Irene's testimony that she was "not sure" if she was raped enhanced her credibility because it showed that she was a fair-minded person who was giving petitioner the benefit of the doubt, at least on the rape charge.  Petitioner claims exclusion of this evidence violated his constitutional rights to confrontation and presentation of evidence.

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts

1    from which jurors could appropriately draw inferences relating to the reliability of the witness."

2    *Olden*, 488 U.S. at 231 (1998).

3                    **A.      State Appellate Court Opinion.**

4            After the California Supreme Court issued its opinion, it remanded for consideration of

5    other claims raised by the petitioner.  The court of appeal affirmed the judgment of conviction

6    and later modified its opinion without change in the judgment.  In its modified opinion, the

7    California Court of Appeal wrote in relevant part (Exh. Q at 2):

8                    Assuming the issue is appropriate for our resolution in light of the
                     Supreme Court's opinion, and assuming it was properly presented
9                    in the trial court, we reject it on the merits.  The jury knew from
                     other evidence that the victim first described her attack as a rape
10                   but then told the nurse who examined her that she was unsure
                     about vaginal penetration.  The inference appellant sought to draw
11                   from evidence of her prior sexual encounter with her boyfriend —
                     that she retracted an intentionally false accusation only because
12                   she knew it would be contradicted by the physical examination —
                     is extremely weak at best.  The court did not abuse its discretion in
13                   excluding evidence of the prior sexual encounter under the rape
                     shield statutes, nor did it deny appellant's right to confront
14                   witnesses or present a defense.

15           In his opening brief, petitioner does not make reference to the state court's decision on

16   this point, which this Court, sitting as a habeas court reviews.  On reply, petitioner asserts that the

17   decision by the California Court of Appeal was contrary to an unreasonable application of the

18   Supreme Court's holdings in *Olden v. Kentucky* and *Delaware v. Van Arsdall*.

19                   **B.      Factual Background.**

20           Amit Patel, the hotel desk clerk, testified that Irene told him at the front desk, immediately

21   after the incident, "I just got raped" (RT 378).  Aslem Shaikh testified that Irene told him shortly

22   after the incident, he "fucked her without a condom."  *People v. Fontana*, 49 Cal. 4th at 358.

23   Irene testified she did not make that statement (RT 318).  The jurors heard testimony from nurse

24   practitioner Johnson-Gelb that at the hospital the night of the incident, Irene reported, "forced

25   vaginal penetration with ejaculation" (RT 578).  Nurse practitioner Johnson-Gelb also testified

26   before the jury that Irene was unsure if petitioner penetrated her vagina with his penis (RT 506,

27   594).

28           In closing, defense counsel stated (RT 1449):

                                                    23

**United States District Court**
For the Northern District of California

1

2

3

4

> Irene told the story that she knew would hurt Danny the most.  She told the story that would destroy him and would take his life away from him.  She made good on her threat to make him pay.  'I'll make you pay for this. You are on parole.'  That was not a lie.  That statement by Irene . . . was threat and a promise.  And she came here and she lied to you about what happened [in order] to make Danny keep paying and paying and paying.

5

6

The defense further supported its theory that Irene was a person who repeatedly lied in order to make petitioner "pay" when defense counsel said (RT 1442–43):

7

8

9

10

> [The prosecutor's] comments to you with regard to this issue were, like most of his others, misleading.  Why were they misleading?  Because he claimed to you that Irene never claimed penetration; never claimed rape.  When everyone that's been here watching this trial . . . knows that she did claim penetration.  She walked out of that room, walked down the hall, and made a claim of rape to Amit Patel.

11

Defense counsel went on to say (RT 1471):

12

13

14

> . . . I talked about the untruths, the lies that Irene told to Aslem about being forced to have intercourse without a condom, and being afraid of getting AIDS.  And about what she said to the nurse practitioner at the hospital, that Mr. Fontana had put his penis in her vagina and had come.

15

16

> Now, we know that was a lie, because . . . the internal swab taken from Irene's vagina did not reveal any DNA that belonged to Danny Fontana.

17

18

19

The order concludes that the state appellate court could reasonably have found that the exclusion of the evidence of the prior consensual sexual encounter did not rise to the level of a constitutional violation.

20

21

22

> **C.   The State Appellate Court Could Have Reasonably Found that the Excluded Evidence was Not in Violation of Petitioner's Rights Under the Confrontation Clause.**

23

24

25

26

27

The state appellate court could have reasonably concluded that the exclusion of the DNA evidence was not in violation of petitioner's rights under the Confrontation Clause.  The DNA swab from Irene's neck tested positive for the presence of saliva and indicated the presence of DNA that was consistent with Irene and petitioner.  The vaginal swabs did not test positive for petitioner's DNA.

28

Compared to the Supreme Court precedent reviewed herein, the excluded evidence was not important and the state had a legitimate interest in its exclusion.

24

The evidence was not important because the defense employed another theory to undermine Irene's credibility and portray her as a liar. The defense attempted to show that Irene falsely accused petitioner to "make him pay." They bolstered this theory by putting forward witnesses who testified that Irene went back on her initial accusations that petitioner raped her. Thus, even if the defense's theory that Irene withdrew the rape allegation out of fear that the rape examination would prove that she was lying about the rape would have assisted the defense in rebutting the prosecutor's theory that Irene withdrew the rape accusation because she was giving petitioner the benefit of the doubt, the jury would have still had other evidence regarding Irene's credibility to consider. The value to the defense of this theory that Irene withdrew the rape allegation because she feared she would be found out to be a liar would not have close to the value of the evidence, the exclusion of which was found to be unconstitutional, in the other Supreme Court cases discussed above.

Finally, the state had a legitimate interest in excluding the evidence of Irene's consensual sexual activities the morning before the incident with petitioner and related evidence that DNA of another man was found on the vaginal swabs. That legitimate interest is preventing harassment of a rape victim by forcing her to reveal in court private and intimate details of her sex life, which if allowed would make other rape victims less willing to come forward and testify against rapists.

Thus, the state appellate court could reasonably have found that the exclusion of the DNA evidence did not rise to the level of a constitutional violation. Even assuming there was a constitutional violation, exclusion of the DNA evidence was harmless under *Brecht*. All the evidence would have shown was that Irene had sex the morning of the incident, but no inference could reasonably have been drawn from that evidence that her consensual sexual activity caused the alleged injuries.

**3.    CLAIM THAT EXCLUSION OF EVIDENCE AND CROSS-EXAMINATION ON THE ISSUE THAT IRENE LIED ABOUT THE TERMS OF HER EMPLOYMENT VIOLATED PETITIONER'S DUE PROCESS AND CONFRONTATION RIGHTS.**

Petitioner also claims the trial court violated his rights to due process and his right to confrontation "by excluding evidence that both Irene and Shaikh lied when they told the jury that she was performing unpaid community service at Shaikh's store" (Br. 38). Petitioner claims the

United States District Court
For the Northern District of California

statements were admissible prior inconsistent statements admissible to impeach Irene and show

that she "was willing to lie under oath to conceal a small amount of taxable income or to protect a

friend from scrutiny by tax authorities" (*id*. at 40).

The state appellate court, the highest court to address the issue, rejected petitioner's claim

(Exh. O at 5–6):

> Irene testified that she did not receive any compensation for
> working for Shaikh, explaining, 'I don't see it as a job. It's more
> like community service.' She denied telling anyone that Shaikh
> had paid her cash under the table. Shaikh similarly testified that
> Irene worked as a volunteer and was not paid anything. However,
> an assistant district attorney who interviewed Irene during the
> investigation memorialized their conversation as follows: 'Irene
> indicated that the store where she met the defendant was near her
> home and that she didn't work there as a scheduled or paid
> employee, but would sometimes watch [the] cash register when the
> owner was not there and be paid an allowance on some cash under
> the table for doing this.' The court excluded evidence of this prior
> inconsistent statement, concluding that it amounted to
> impeachment on a collateral issue . . . .
>
> In this case, evidence that Irene had lied about receiving cash
> under the table would not have significantly affected her
> believability as a witness. A person's willingness to conceal a
> small amount of taxable income or to protect a friend from scrutiny
> by the tax authorities does not make that person more likely to
> falsely accuse someone of sexual assault. Appellant complains
> that the prosecution was allowed to falsely portray Irene as a
> recent immigrant who was trying to better her situation through
> hard work and education. But the portrait painted by the
> prosecution was supported by the evidence, and it would not be
> significantly altered by information that Irene had received a small
> amount of cash under the table for working a few hours here and
> there for a friend. The trial court did not abuse its discretion in
> restricting the impeachment evidence on this point and did not
> violate appellant's rights under the Confrontation Clause.

Petitioner does not address the state court's opinion and thus fails to explain why it was

unreasonable. Indeed, the claim addressed in this section drops out completely on reply.

Petitioner argued that, "the jurors might have formed a significantly different impression of

Irene's credibility if they had heard cross-examination showing that Irene was willing to lie under

oath and that she had a motive for lying because she was protecting herself or a friend . . . [and

that] Irene's credibility or reliability as a witness was *the* central issue in the case in terms of

Fontana's defense" (Br. 40–41) (emphasis in original).

United States District Court
For the Northern District of California

The state appellate court's reasoning is persuasive on this issue.  Meaning, even if the proffered evidence showed Irene was lying, such a lie would not make it more likely that she would falsely accuse another of rape.

Petitioner bears the burden of showing the unreasonableness of the state court decision. *Viscotti*, 537 U.S. at 25.  Petitioner has not addressed the state court decision nor shown it to be unreasonable.  Thus, petitioner has not met his burden.

**4.      CLAIM THAT EXCLUSION OF EVIDENCE AND CROSS-EXAMINATION WHICH WOULD HAVE CORROBORATED PETITIONER'S TESTIMONY VIOLATED HIS RIGHT TO PRESENT EVIDENCE.**

Petitioner also contends that the trial court violated his constitutional right to present evidence by excluding evidence that Irene had had consensual sex earlier in the day that would have corroborated his testimony that he observed semen between Irene's legs in her privates.

The California Supreme Court found the following (RT 368–69):

> Defendant contends that the trial court erred also in excluding evidence that Irene had engaged in intercourse earlier that day, which could have corroborated his testimony that he saw semen 'between her legs in her privates' when she was in his room.  In excluding this evidence, the trial court remarked that the alleged conduct was earlier in the day.  As such, it's not specifically corroborative of the defendant's claim of visible semen in the afternoon at 4:00.  Furthermore, it's offered to apparently corroborate the defendant's utterly fantastic and inherently unbelievable and incredible claim that the complaining witness on her own initiative, despite refusing to come up before, on her own initiative came up to the defendant's room after recent sex with [her] boyfriend and without drying herself in a condition where she would be uncomfortable, wet and unappealing, where her object was apparently to trade sex for a laptop because she didn't have any money, and in achieving that object, she was to present herself to the defendant.  In that condition, she would be presenting herself to the defendant in an obviously unappealing and unattractive condition, which would have the direct effect of defeating the very object of her visit' . . . .
>
> The probative value of the corroborating evidence was slight at best.  Even if a fact finder were to fully credit defendant's testimony that he saw semen 'in her privates,' that fact would not have shed much light one way or the other as to whose version of the events, defendant's or Irene's, was the true one.  Under either version of what occurred, Irene was naked, thus affording defendant the opportunity to see 'her privates.'  Yet the presence of semen would have tended to undermine defendant's account since, as the trial court stated, if Irene had plotted to entice defendant into giving her the laptop in exchange for sex, one would expect that she would have taken at least the most minimal

United States District Court

For the Northern District of California

steps to make herself desirable.  Likewise, defendant testified that he took off his shirt and approached Irene even after he had observed her condition — which is presumably the opposite of how one would have acted if he had seen semen 'in her privates' and had become disgusted.

Moreover, as the trial court also found, defendant's claim that there was visible semen 'in her privates' several hours after Irene had intercourse and despite her having worn panties in the interim defies gravity and common sense, and defendant offered no medical foundation that could link his observations to her prior conduct . . . .

The potential prejudice of this evidence, on the other hand was substantial.  For some jurors, the fact that the victim has engaged in sexual conduct outside of marriage automatically suggests a receptivity to the activity is proof that the victim got what she deserved — neither of which is a rational or permissible inference.  In addition, the Legislature has determined that victims of sexual assault require greater protections beyond those afforded other witnesses against surprise, harassment, and unnecessary invasion of privacy and defendant's inquiry would have violated those interests.

Finally, defendant had little need to establish that Irene had actually engaged in sex that day in order to support his contention that he was disgusted by the appearance of 'her privates,' since it can be difficult to distinguish visually between seminal fluid and cervical mucus, which is a normal discharge that increases around the time of ovulation.  Defendant's testimony depended on his belief that what he saw was seminal fluid, and counsel made precisely that point in argument:  'Maybe it wasn't'
 . . . Hence, he had little need for proof that what he observed was actually semen.

On those grounds the California Supreme Court concluded that the trial court did not abuse its discretion in excluding the evidence that Irene had engaged in sexual intercourse earlier that day.  The evidence was not important as corroboration evidence.  As the California Supreme Court reasoned, if Irene were trying to entice petitioner as was petitioner's theory, displaying herself in the way petitioner described would seem antithetical to that purpose.

Finally, the state had a legitimate reason for excluding the evidence, which was to protect Irene from harassment and not discourage rape victims from coming forward and testifying against their rapists.

Thus, the California Supreme Court could reasonably have found that the exclusion of Irene's prior sexual encounter as corroborating evidence did not rise to the level of a

constitutional violation.  Because the order finds no violation of United States Supreme Court precedent, it need not address the harmless error analysis.

**5.      CUMULATIVE ERROR.**

Petitioner claims that the cumulative errors in his trial violated his federal constitutional rights.  Even assuming there was an error of constitutional dimension in excluding evidence of Irene's prior consensual sexual encounter, with respect to petitioner's first claim, that error was harmless.  There is no error to accumulate.

### CONCLUSION

For the reasons stated above, the petition for writ of habeas corpus is **DENIED**.  Rule 11(a) of the Rules Governing Section 2254 Cases requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner must make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  He has failed to do so. Consequently, a certificate of appealability is denied.

The Clerk shall **CLOSE** the case file.

**IT IS SO ORDERED.**

Dated: May 18, 2012.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California